21-1155. And I think you all are, the appellees are dividing your time. Yes, your honor. Okay, just just for warning, how you all divide your time, that's up to you guys. So whoever talks first. Yeah. Well, hold on just a second until they shut that back door. Good morning. You may be seated. William Eubanks for the petitioners, and I'd like to reserve three minutes for rebuttal. Mr. Eubanks, before you get started, I have a preliminary question. Was it ever stated by FERC when you should have moved to intervene? Yes, your honor. There was a federal register which required intervention. What's the date? I believe that was in February of 2017. It's in the factual background of our opening brief, and it allowed, I believe, a 60-day window, and the intervention window closed in early April of 2017. So that was prior to the issuance of either a record of decision or a section 404 permit by the Army Corps of Engineers. That's my only question, so proceed as you were. Thank you. This case is about the U.S. Army Corps of Engineers compliance with federal law in issuing Denver Water a section 404 permit under the Clean Water Act to deplete vast quantities of water from the Colorado River. Petitioners do not challenge any agency decision required by the Federal Power Act, nor do we challenge FERC's separate legal compliance in issuing a license to Denver Water to expand one hydroelectric facility in Boulder County. But on, I mean, you have several claims under the Clean Air Act, or the Clean Water Act, the Endangered Species Act in NEPA, and on the NEPA claim, with regard to the NEPA claim, and to some extent under the Clean Water Act claim, in your supplemental petition, you have asked for vacator of the environmental impact statement, and FERC, in its order, did issue an environmental assessment that appears, arguably, to have relied on the environmental impact statement. So by asking for vacator of the environmental impact statement, would that indirectly disturb the environmental assessment, which was part of the predicate for FERC's grant of the amendment to the license? Your Honor, there are a couple of responses to that. The first one is that the actual final agency action that is, that relief is sought against here, is the record of decision issued exclusively by the Corps of Engineers, as well as the Section 404 permit issued exclusively by the Corps of Engineers. The EIS is merely the underlying environmental analysis and contains some of the findings that ultimately supported those decisions. But, you know, in EIS, there is some dispute in the case law about whether an environmental impact statement or an environmental assessment itself is even subject to judicial review, because that's just the underlying analysis. An agency must still issue a final agency action under the APA, and here there are three. We challenge two of them. We challenge the Corps' 404 permit. We challenge the Corps' record of decision, where it made all of its findings under the Clean Water Act that we challenge on the merits in this case. We do not challenge the third, completely distinct final agency action, which is FERC's licensing decision. We've never had any interest in challenging that, and we've made that clear from the beginning. So if you prevail on the things that you are challenging, what's the status of the project? So, Your Honor, this would be exactly the situation that was presented to the Ninth Circuit in the Snoqualmie Valley case, where, similarly, a coalition of environmental plaintiffs challenged a Clean Water Act permit and the NEPA analysis underlying it, and that court said that this is not a collateral attack on a FERC order, because no one is challenging the FERC order. The fact that the Corps of Engineers may have to go back and do some additional Clean Water Act compliance or some additional NEPA compliance with respect to the issues in the Corps of Engineers' purview, it will have an indirect effect on how the project proceeds, but that is not a collateral attack on the FERC order. And so this is the same situation. Would you agree it will have a collateral effect on the FERC order? It's hard to say, Your Honor. We certainly are seeking no relief against the FERC order here. So the FERC order and license will stay intact. We are asking for no relief from the court. So even if we won everything that we seek on the merits, it would have no effect on the FERC order or the FERC license. So how about if you successfully attacked the Clean Water or the Corps' decision and the project was still moving forward, is it your position you would just sit and watch it go forward? Your Honor, I think that's a question for a different day. I just want it to be open what's going to happen because it seems to me like in our Williams case, we're sort of looking at the breadth of all of this because it all fits together like a puzzle or like a three-legged stool. And if you take one of the legs out, the whole thing falls down. It may or it may not, Your Honor. Most of the claims we've pursued against the Army And so it might be that if we won on the merits, that there would be some temporary delay while the Army Corps were to comply with its duties under federal law. Whether or not that would have any permanent impact on the project, it's really impossible to say at this point. And in fact, I would submit that the Supreme Court's recent decision in Penn East is controlling here, binding directly on point decision where there was no challenge to the for that pipeline was making sovereign immunity arguments that if sustained by the district court in that case, would have prevented permanently the construction of the pipeline by Penn East. And so the government made this exact argument that's made in this case to the Supreme Court and the Supreme Court rejected that argument and said, unless you are challenging the FERC order itself, the fact that some indirect relief might permanently affect the project's collateral attack on the FERC order. And so we would submit that, you know, the Supreme Court's first revisiting of City of Tacoma in decades is squarely on point here and should be, you know, the binding precedent where this court should look. We also think it's going to... Mr. Eubanks, assume we reverse this and send it back. And proceeding on the, and Denver felt very confident and they proceeded with the FERC order. Are they limited to just this? They can expand the capacity of the dam for the possibility of more water from some source, including the Moffitt project by expanding the, what is it, the Gross Reservoir. But that's just a hypothetical possibility, but it's not going to interfere with building, expanding that dam. Is that the result? My understanding is that to move forward and counsel for Denver Water can certainly clarify that the company will need both approvals. It needs the Clean Water Act permit for certain dredge and fill activities for this much larger water supply project that the Army Corps reviewed. It also needs this much narrower license from FERC as to the hydroelectric component of the dam and reservoir. And so again, if the Army Corps were, if we won, you know, on the merits of the case in the district court, the Army Corps would have to comply with federal law before the project could move forward. It is possible that the district court would have to evaluate, you know, whether to exercise discretion for certain types of relief. If we got that far, that's a question for a different day. So I thought that there were some things that they could do without the Corps' permits under the order as it exists now. There may be, Your Honor, and I... What? There may be some, you know, road widening activities. I believe those are actually underway as we speak. There are some other sort of preliminary construction activities, none of which would require an Army Corps permit. Because again, the Army Corps' jurisdiction is concerned with dredge and fill activities that put material into waters of the United States. Could they go so far as to complete everything just waiting for a source? And if they failed with the Corps of Engineers on the Moffitt collection system, then they could seek another source. You know, maybe go on this side of the continent. That is possible, Your Honor. I would have to look at the two, the permit and the license, very closely to answer that, you know, with full accuracy. I will say that there are, again, activities that could go forward under the FERC license without a 404 permit in place. I think it's also important to recognize that what Your Honor is referring to goes to the issues that we have pursued in this case, including the Corps' responsibility to determine the least environmentally practicable, sorry, the least environmentally damaging practicable alternative, what we call the LEDPA analysis under the Clean Water Act. That is something that the Corps and only the Corps can decide because Congress exclusively assigned that to the Army Corps. And here, our view, and we're pursuing this on the merits below if we get an opportunity to go back to the district court, is that the Army Corps looked at 303 alternatives, but dismissed a number of very important alternatives for the Denver metropolitan area, including conservation efforts, gravel pit water storage, and many other alternatives that engineers said these things are practicable and they would have far less damaging effects on the environment as part of this larger water supply project. And so we would really like the opportunity for a court to look at that, to have our day in court, and have the Corps do what it's supposed to do under federal law. All right. The fish and wildlife issues, did I misunderstand this, that they are in a sense irrelevant to this because they do not involve aquatic life that would be affected by this project? So Your Honor, that is only true as to the FERC license. So FERC candidly admits in its final order, licensing order, that there are no green lineage cutthroat trout, which is the protected species anywhere within the FERC project boundary. In fact, that species is located on the west slope on the other side of the continental divide in the much larger project boundary of the Army Corps of Engineers. Those are in the headwater streams of the Colorado River. The legal claims relate to what the ESA protections are that would be afforded to that species, and we have challenged that. But the biological opinion that was issued by the Fish and Wildlife Service was issued only to the Corps of Engineers, and only prescribed terms and conditions against the Corps of Engineers. It does not do anything with respect to FERC, because FERC's project does not contain any endangered or threatened species. Is that a yes as to its relevance? It's not relevant? It's certainly relevant to the merits of our claims, but it's not relevant to FERC at all. Okay. And so unless there are any other questions, I'd like to reserve the remainder of my time for rebuttal. Thank you. Well, Paul, turn the clock off. I just have one question. Do we have to evaluate whether or not this is a collateral challenge on a FERC order on an issue-by-issue basis? In other words, I know you argue that it's not a collateral challenge on all three of your claims, but for our analytical purposes, do we have to independently evaluate the issue, whether this is a collateral challenge under the ESA, under the NEPA, under the CW, the Clean Water Act? Our view is no. The crux of the challenge is to the Army Corps of Engineers issuance of its Section 404 permit and the legal compliance that goes along with that. And so it's part and parcel of the permit decision. Those things can't be divided or segregated out. It's all part and parcel of the same decision. If hypothetically, if the FERC license, let's say, I'm not going to try to imagine a scenario, but hypothetically, if FERC issues a license amendment order that says nothing other than there has been extensive data that was provided by the Corps of Army Engineers, we incorporate such as if it were our own data and we are relying exclusively on the data provided by the Corps of Army Engineers, and then you challenge the findings under the Corps of Army Engineers, would you agree at that point that this falls within the City of Tacoma? No. As a matter of law, Section 404 permits are operative the day they are issued. And this is clear in the Clean Water Act regulations, which we have cited in our briefs. You don't have to wait for some further action by another agency. And you can go straight to court, federal district court, to seek judicial review of that. And in fact, I think this court's precedent in National Parks Conservation Association is telling. There, we had sort of a similar situation under the Federal Aviation Act. And what this court said is, quote, the actions of the BLM were made at the request of, and as part of the FAA's planning process. That will never be true with the interplay of the Clean Water Act and the Federal Power Act, because the Corps of Engineers does not act in response to a request from FERC. It does not act because of the Federal Power Act. It acts because it receives an application from an applicant like Denver Water, and it has a legal obligation to respond to that irrespective of anything that FERC may do. So there is no situation I can think of where a Section 404 permit would have to go up to a court of appeals. And in fact, I think it's quite instructive that the other side has not pointed to one case, even outside of this context, where a Section 404 permit has been reviewed first by a court of appeals. To my knowledge, in 50 years, it has never happened. This is a truly unprecedented situation. All right. Thank you. Because I gave the appellate an extra minute, the appellate has an extra minute. Thank you, Your Honor. Good morning. May it please the Court. Justin Hemminger for the Federal Appellees. I will take between 9 and 10 minutes, and counsel for intervener, Denver Water, will take the balance of our time. This appeal involves a single jurisdictional question under Section 313B of the Federal Power Act. In the city of Tacoma, the Supreme Court said that that provision provided for exclusive review in the courts of appeals of FERC orders and all issues in hearing in the controversy over that order. Do we determine that issue at the time that Secretary Colorado and the other petitioners filed the complaint in district court or at the time that FERC issued the license amendment order? Thank you, Your Honor. That's a great question. I think there are two ways to look at that. One is you can look at what the plaintiff or here the petitioner pled, and you can line that up with what has happened so far in the proceeding before FERC. But the reality is that Section 313B says that FERC's order, once the order issues,  and so in most instances, it's premature to determine whether jurisdiction lies in the district court or in the court of appeals until we see what FERC has done. Well, I think that is to ask the question rather than answer it. I don't mean that pejoratively it's a good answer, but when we look at diversity jurisdiction, when we look at standing, when we look at federal question jurisdiction, we always, without any controversy, I think, look at the time that the action is filed, the complaint is filed. And so in December of, what was it, 2018, when the petitioners filed the complaint in district court, there was no 313B issue. FERC hadn't done anything. And so at that point, I don't think there's any question that there was jurisdiction in district court. It's only after a year and seven months later when FERC issues the license amendment, now there's an issue about exclusivity. But that's why my question exists. I mean, I think your colleague in her reply brief cited Justice Souter's decision on the First Circuit, which suggests that we don't look at the time of the filing of the complaint, we look at the time of the administrative order, the subject of the Direct Review Provision, but that doesn't make any sense to me. It's so contrary to how we look at jurisdiction in every other context. So, Your Honor, it's an unusual scheme, but Congress, remember, Congress set this up. And what the EPA says is that you always, you prefer, you turn toward the exclusive jurisdiction provision over the general provision. So part of this is what do parties, what do we know about this proceeding? Go back to the beginning. This is 2003, Your Honor. FERC and the CORE agreed in 2003, they entered into a cooperating agreement and said, we're going to collaborate on this environmental review for this project. So this is not a situation where no one knew what FERC was doing and how it was going to relate to what the CORE was doing. This is a situation where, in fact, the agencies worked together, collaborated for more than a decade on a single integrated environmental analysis. That's the environmental impact statement that the CORE issued with FERC's cooperation and that FERC relied on in issuing its order. Well, let's take, let's take that example. So, so we took the environmental impact statement. Well, the only environmental impact statement that was done in this case was the CORE over the whole geographic scope of the Moffitt Project. There was a discussion just a second ago about the fact that there's no green lineage cutthroat trout within the geographic scope of FERC's regulatory jurisdiction because in the hydroelectric facility itself and the reservoir, there were no green lineage cutthroat trout, but there sure as heck were green lineage cutthroat trout in the upstream and downstream waters that were subject to the Moffitt Project that, that was subject to the CORE's and only the CORE's jurisdiction. So just that example, the environmental impact statement was quite different from the very limited environmental assessment over just the confines of this little area that was going to be the reservoir itself that the, that, that FERC did the consider for the, for the licensing. So there's, there's cooperation, but there was cooperation between two completely different things. Your Honor, I disagree. So the record, and if you, if you go and look at the, the, the government's appendix, you won't see most of this in, in the petitioner's appendix, but if you look at the government's appendix, we've walked the court through how this project is a, this is a single project. It's a water supply project, but the, but the central component at the heart of this is the gross reservoir and dam. That's exclusively within FERC's jurisdiction. That's the CORE of this project. And, you know, the counsel for the appellants tries to sound, make that sound like a narrow, narrow project, but this is a dam and a reservoir. That's what's going to hold the water. That's FERC's authority. So from the very beginning, FERC played a central role in this entire process. And the, FERC's order, its final order, and this is jurisdictionally dispositive, relied on the environmental impact statement that the party, that, that the agencies collaborated on. And I'll give the court the site because I think this is important. It's in the government's appendix. And it's at 177 to 178. That's where FERC says in its order, we are relying on the environmental impact statement that the CORE issued. Of course, the FERC cooperated on it, but that's the NEPA claim. That's what we hear is in the controversy. If you look at the supplemental petition that the appellants filed, their primary challenge is to the NEPA compliance that the CORE did, but it's the same NEPA compliance that FERC relied on. Your Honor referred to the environmental assessment that FERC did. That is a secondary analysis. It's a, it covers a few specific issues that relate to FERC's license. It's not an analysis of FERC's entire project. In the, in the, in the supplemental, in the supplemental environmental assessment that FERC did, FERC says very specifically, we're relying on the environmental impact statement for compliance on most of these issues. This is in the government's appendix. And I'll give, give the court the sites. It's at 118 through 161. If you read those pages, you'll see FERC is relying on the environmental impact statement. And to sort of go to what Judge Carson is saying, we think the analogy here of a stool or a puzzle is a good one. We think this is one project in integrated environmental analysis. And from very early on, it was clear that FERC's order was going to be the final piece of that puzzle that would put this project in motion. But, but what do we do with FERC's view in other decisions that 404 permits are not prerequisites to a license? That, that seems to me to state the issue very well. Maybe it's, it's just not a prerequisite, so they're separate and one should proceed in district court and the other in the court of appeals? Well, Judge Murphy, we, the government hasn't argued that all 404 permits that relate to a hydropower project in some way, you know, tangentially have to be reviewed by the court of appeals. Our argument is very sort of straightforward and modest. Here, you look at the issues as they came up in these proceedings, how the agencies handled the NEPA compliance, how they handled the clean water compliance, and you sort of the agencies worked together on this to reach a final result. And in that context, we think the 404 permit has to be reviewed by this court. If you don't... Isn't that inconsistent with other decisions of FERC, though, what you're saying? So, Your Honor, the 404 permit may, whether it's a prerequisite or not, FERC doesn't have to incorporate it into its license as a term of the license in order for issues to adhere in the controversy. And this is City of Tacoma. But if it's not a prerequisite, that almost sounds like it does not adhere. So, Your Honor, I want to look at this a little bit differently. So look at how FERC addresses these issues. So some of this is simply exhaustion, the question of whether you have to present an issue to FERC. That is a very basic and low bar. And in fact, I'll point the court to the Third Circuit's decision in Adorers of the Blood of Christ. In that decision, the question was whether a RFRA claim, Religious Freedom Restoration claim, needed to be brought to FERC and exhausted and then challenged in the Court of Appeals. And FERC, in that case, took the position that that sort of claim has to go before it. FERC has no RFRA expertise, but the question is not whether FERC has RFRA expertise, whether it has RFRA authority. The question is, is it appropriate for FERC to consider the issue and pass on it in reaching its order for a hydropower project, or in that case, a Natural Gas Act case? Same thing under the Endangered Species Act. FERC doesn't have ESA expertise. But if you look at the Schaefer and Freeman case from the D.C. Circuit, in that case, FERC said, you know, FERC considered the biop, the biological opinion, and then that was challenged directly in the Courts of Appeals. First of all, should, would you have to, would a challenger have to exhaust prior to the issue of a biological opinion in the context of the ESA or in the context of NEPA, an environmental impact statement? Do you have to challenge prior to that? You present the issue to FERC. And you have to do that even before they've issued an environmental assessment or a DSI? It may be before or after. But it may be before or after. But, and I don't want to leave time for the Intervenors Council. So, yes. I would, yeah. But just to give her six minutes, isn't it important that the permit was not incorporated into the final FERC order? So, Your Honor, we think that that is certainly something the Court needs to consider. That's, this is the inherent controversy analysis that the Court does. And I want to, I actually think it is claim by claim and issue by issue. And, but in, in, in. So, are you, are you saying it did not incorporate the permit, but it did incorporate issue by issue? It incorporated the NEPA compliance, the NEPA analysis that, that the Court prepared. It did not incorporate the 404 permit itself. FERC has never done that. But the fact that it didn't incorporate the permit doesn't mean that that permit can't be reviewed by this Court directly. And the problem with, with, with Appellant's position comes, boils down to bifurcation. And I, with the Court's permission, I'll spin out how that could have played out even in this case. Under Appellant's theory, Boulder County, another, another entity, did, in fact, timely intervene. They timely intervened in FERC's proceeding. And they raised issues about NEPA compliance. So, Boulder County, therefore, had the right to present its challenge to petition for review in this Court, or under the Federal Power Act, they can also petition for review in the D.C. Circuit. So, under Appellant's theory, you could have had a situation where Boulder County was petitioning for review and challenging the NEPA analysis in the D.C. Circuit. And Appellant's would be challenging it in the District Court, as they have here. That's bifurcation. That's what National Parks Conservation Association, this Court's decision, Custer County, and Williams Natural Gas say you don't do. You don't break apart different parts of an environmental compliance and then allow different courts to review it. If they had filed in this Court, if Boulder County had petitioned for review in this Court, then this Court would have had two cases challenging the same NEPA compliance. Again, that's contrary to what Congress wants when it establishes an exclusive jurisdiction provision. If there are no further questions, thank you very much. Paul, she had asked for six minutes, right? She did. All right. You have six minutes. Thank you so much, Your Honors. Amanda Berman for Intervenor Denver Water. Under the inherent controversy standard as this Court has applied it at National Parks and Custer County, the Court has to look at whether the particular issues that these petitioners raise below adhere in the controversy that FERC decided. And that's true here for two reasons. One, because of the unique history of this project, the expansion of Grosse Reservoir and Dam. And two, because of the nature of their three claims under NEPA, under the ESA, under the Clean Water Act. You can see from the very introduction to their petition below that they are challenging the project. They argue that a different alternative should have been selected, both under NEPA and under the Clean Water Act. That was true in Penn East, too, though, wasn't it? Your Honor, there's a real difference with Penn East. In Penn East, the Supreme Court pointed to the fact that the issue there was whether under a different provision of the Natural Gas Act there was a right to proceed with condemnation provisions. And it noted that FERC's order had not addressed that issue at all. Here, the issues they raised, the issue of whether this is the right alternative, that was raised before FERC, including by some of these petitioners. For example— What about the LEDPA claim? So, yes, Your Honor, the LEDPA claim is a subset of their NEPA claim. If you go back and you look at their petition, you know, their NEPA claim has many parts, but it mostly goes to the alternatives analysis. And the LEDPA claim is that you didn't select the least environmentally damaging alternative— Did FERC ever address that? Yes, Your Honor, FERC did address that. And I would like to point you to—so, as I mentioned, one of these petitioners, the LEDPA, raised comments making that LEDPA argument before FERC in 2017. Well, people make comments on all sorts of stuff. Yes, Your Honor. They made comments about UFOs. I mean, speaking of the FERC order, did this— Yes. Okay, that's what I'm interested in. I just wanted to mention the timing of that because it was before the intervention deadline, so they could have then intervened. But then FERC responded to their comments, and they also responded to Save the And you can see their response at pages 142 to 246 of the government's appendix, and that's in the supplemental EA document. And in that supplemental EA document, they also said, we are explicitly incorporating the EIS, and that together with the EIS, the supplemental EA, and the ROD, the record of decision, those three things provide our—and I'm quoting here—complete record of analysis for FERC's licensing decision. So, Your Honor, these are all pieces of the puzzle, and they all go to the heart of the project. Should this project, expanding the reservoir and dam, be the thing that Denver Water does to solve its very real water supply issues for the citizens of Denver and surrounding areas, or should it be something else? And if this court were to send this back down, and the district court did what petitioners asked, there is no question that we've got a real problem, and that threatens whether the project can go forward. You know, they asked the district court to enjoin the project, and if they're saying, if their claim is that the alternatives analysis was wrong, you picked the wrong thing, then how on earth can my client move forward with the project, the expansion of the reservoir, the raising of the dam, while it has to reassess whether that's the—the court has to reassess whether that's the right alternative? So they are challenging the heart of this very project, Your Honors. Your Honors, I'd also like to point the court to a couple of other things in the record. You know, none of this should have been a surprise to the appellants that FERC would be relying on the EIS, would be relying on the alternatives analysis that the court did. Back in 2008, my client, Denver Water, put a letter out to stakeholders, and you can see this at pages 14 to 16 of the government's appendix, and it notified them that the EIS, the Coors EIS, would be part of its licensing application to FERC, and that the alternatives analysis would be the basis for FERC's own decision. And that's exactly what then happened. We attached the EIS to our license application. That's what FERC noticed in February of 2017. That's what it told folks to comment on, and folks did comment on it. They very much challenged the alternatives analysis, arguing about whether this project or some other alternative should be chosen. So these are issues that could have, should have, and in fact were raised before FERC. But then what petitioners failed to do was simply file that intervention motion before FERC so that they could pursue those issues they had raised in comments before the agency, and that's all they had to do. Your Honors, it doesn't matter whether FERC would have said, as FERC said about the biop in the Schaefer and Freeman case, we're not going to get into that. We're going to defer to the Coors expertise. That's exactly what FERC said in the Schaefer and Freeman case, and the D.C. Circuit said, rightly, I think, that's all that you have to do. You raise it before FERC. If FERC defers, fine. We, the Court of Appeals, can look at the record, and all of this information is in the record, the RAW, the EIS, and we can decide if the decision is sound on that basis. So all they had to do was file their timely intervention motion, and these issues would have been pursued before FERC, and they could have pursued them in a Court of Appeals challenge. Would a FERC have issued an order even as of now? Would you still say that the petitioner could not obtain subject matter jurisdiction in district court? I guess it's the same question I asked your colleague. Yeah. In December 2018, there was no FERC order. There was no license amendment. Same question. Your Honor, you know, always consider jurisdiction at the time of the inception of the complaint, and there's no anomaly in this case. There's a lot of complicated issues, but one thing that's not complicated is there clearly was jurisdiction in district court in December 2018 when they filed their complaint in federal district court in Colorado. Well, with respect, Your Honor, I do think Justice Souter got it right. You know, that's the tough case, but time and events have eliminated whatever district court jurisdiction there was. Why? He didn't sign anything for that, though. Well, Your Honor, I'd point this court to its own statement in the Williams case that jurisdiction is exclusive to FERC when FERC's order issues. So I think that also makes that the standard of this circuit as well. And Your Honor, there's no unfairness here to that because as of 2018, everybody knew that the EIS was going to be the basis for FERC's decision. But nobody knew what it was going to be. Nobody knew what FERC was going to do. Well, they knew that whatever FERC was going to do, and they knew that FERC was going to rely on the EIS and issue its supplemental EA, which was, you know, which came out right around that time. You know, FERC had been clear that that was going to be its record for decisions. So they knew where they should have been. And I think that's evidenced by the fact that these petitioners, save the Colorado, then tried to intervene late before FERC and said, wait, we won't be able to raise our claims if you don't let us do it here. So they realized that they should have been in that proceeding, but they failed to file the timely intervention motion. So, Your Honor, I see that my time has expired. I do appreciate the court giving me time to present Denver Water's views. Thank you so much. No, thank you. Thank you. Your Honors, I'd like to make a couple of brief points in rebuttal. First of all, every single case cited by the respondents is a case involving FERC's legal compliance in issuing a license. That is not an issue in this case. So the Adores case, for example, from the Third Circuit involved whether FERC had complied with its Religious Freedom Act obligations. And that is true for every other case, whether it's the Endangered Species Act, NEPA, or some other law. The question is whether FERC complied with law in issuing a license. That is not the issue here. This would be a fundamental, fundamental change in how Section 404 permits are addressed by courts, as well as many other agency actions. A couple other points. FERC's reliance on an EIS alone cannot be enough to inherit the controversy, just mere reliance on a document. What matters here is that the claims we have pursued, every single claim in our supplemental petition for review, is something that is exclusively within the jurisdiction, the statutory authority, and the competence of the Corps of Engineers. It all goes to the heart of the purpose and need that the Corps has to independently verify, as to the LEDPA analysis, as to the larger Moffitt Collection System project. The question before the Corps of Engineers was, how do we supply? Do we need to supply water to Denver? And if so, how? The question to FERC was much different. The only question was, do we raise this one dam? We don't care about that issue. We are not suing about that issue. We care about the much broader, much more precedential issue for the Colorado River, which is, is this water needed, and where does it come from? That was never before FERC and never will be. So that cannot inherit the controversy. I'd also like to mention the inherent unfairness here, which I think Judge Bacharach has touched on. The Corps of Engineers, despite its obligations as a federal agency, a forward-facing agency, never once told the public in its record of decision, or its 404 permit, that if you want to go to court over this, you need to first exhaust remedies to a different federal agency, FERC, even though that is a fundamental obligation on agencies if they want to impose an exhaustion requirement. Then, one of my clients did go to FERC out of an abundance of caution. It did not intervene because at that time it had no standing to do so, which is required under FERC's regulations, because at that time there was no final Corps of Engineers permit. So we had no reason to be before FERC because the Corps permit has always been our issue. And then what did FERC say? Consistent with 60 years of precedent, FERC told my clients, you're in the wrong place. If all you want to do is sue the Corps of Engineers, including the EIS that we're relying upon, the place you need to go is federal district court. Your failure to intervene here will have no impact on your ability to seek judicial review. Three years later, for the first time ever, in court when it was too late to go back to FERC, the Corps of Engineers for the first time said, sorry, gotcha, you were required to go to the Court of Appeals. That is extremely unfair, extremely prejudicial, and we would submit that that cannot be the way that this is supposed to work. Do you have any questions? Thank you, Your Honor. Thank you. We're going to take a quick 10-minute break, but before we do, I just want to tell all four of you that the briefing and the arguments I thought were absolutely stellar. So I appreciate it. It didn't make it easy for us, but you did your job well. Let's take a 10-minute break.